The next case is Honey Fund v. Governor, State of Florida John Ohlendorf is here for the Appellants, State of Florida Douglas Hallward-Dreimeyer and Shalani Agarwal are here for the Appellees When you're ready, Mr. Ohlendorf, you may begin your argument. Good morning, Your Honors, and may it please the Court, John Ohlendorf for the Appellants. Florida's Individual Freedom Act bars businesses from mandating their employees to attend workplace trainings endorsing any of eight concepts that the State has determined to be discriminatory and offensive, including the odious proposition that members of one race are morally superior to another. Now, businesses, including plaintiffs, remain as free as they ever were to espouse those concepts and to advocate for them both inside and outside the workplace. The Act does not restrict that speech at all. Instead, the Act bars only the conduct of threatening an employee with termination for declining to attend a training inculcating one of these ideas. I have a hypothetical for you. Let's say that the law says social media companies must delete all followers from accounts that express pro-communist viewpoints. Does that govern speech or conduct? Your Honor, in this Court's net choice decision, I think, Your Honor, it would be smart to  question, but taking it as binding here, the way that I read net choice is that a decision to host speech or to delete speech is itself speech on the part of the speech host. How is that different than this? Why, if this company wants to host speech, then why is that conduct? Because the company is not hosting the speech. Any company remains free to host speech, host workplace trainings, espousing any concepts, at least setting aside any independent Title VII problems. You just can't actually train, you just can't actually let them train people at their workplace trainings. No, Your Honor, what they can't do is they can't require employees to attend. That's the, that's the con. How do you train an employee if they don't have to go? I've had a lot of required seminars that I would have really liked to skip in my life. Of course. Regardless of the content, you just have other things to do, right? Of course we do. I've been fortunate that we don't have very many of those. But I understand, Your Honor, but the fact remains that the company in that position is able to host speech. The equivalent in the social media context, Judge Grant, would be some sort of requirement that people look at the speech that's been hosted, right? And a social media company can't force its host... Are you doing it to look at the speech, too? I mean, how would anyone know beforehand whether the speech at issue would fall within the parameters set by the law? Well, I'm sorry, I'm not quite sure I get the... I don't see how you know what it applies to unless you know the content or even the viewpoint of the speech. We acknowledge that, Judge Grant. There's no question that one has to look at the content of the speech that goes on at the trainings in order to determine whether the restriction on conduct has been triggered. But that, Your Honor, is common throughout the laws. We've cited the statement from Hill v. Colorado in our papers. That was the case in this Court's recent Norwegian decision, right? The Court had to look at the content of the communicational exchange between a business and their customer and whether that communication exchange revealed that the customer was vaccinated against the coronavirus in order to determine whether the subsequent conduct, the denial of service to the customer, was prescribed by the act. You had to look at the content in the ordinances in the Otto case, too, right? That's correct, Your Honor. I think, Your Honor, your opinion in the Otto case is clearly not on point here because there, no one disputed that what was being restricted was speech. Oh, sure they did. They argued all day long that it was conduct, that this is our conduct of offering medical treatment, not our speech. And the holding was, essentially, if it's just speech, then what can it be besides speech? So I read Otto as being akin to the Supreme Court's decision in Holder v. Humanitarian Law Project, the Cohen v. California case, where you have a regulation of conduct and it's just speech comprises the conduct, the speech of uttering, the conduct of uttering words, the conduct of wearing words on your jacket. Clearly, when a conduct regulation is applied to speech itself, that is a restriction on speech and is a cognizable First Amendment claim there. That was the case in Otto. So if you can't tell whether the law applies to this purported conduct unless you know what the speech is, how is that not restricting speech? Because the resulting burden, once you've undertaken that analysis into the content of speech and determined what the burden is triggered, the resulting burden is on the conduct, not on the speech. But what, the conduct is not being able to fire someone for failing to attend a workplace seminar that no one ever wants to attend anyway. Correct. The conduct is not being able to terminate an employee for declining to attend the seminar. And that is not, that is not itself speech. That is conduct. That is separately, to use the district court's phraseology, that is separately identifiable from speech. Now, you only know whether that, that separately identifiable conduct applies after a threshold examination of the content of speech. But again, that is the same thing with, you know, with tax subsidies that only apply to certain types of speech. With, with disclosure requirements, this court in the Tracy versus Florida Atlantic University case dealt with a disclosure requirement where faculty had to disclose a speech that, that comprised a professional practice. How about, how about this one? Companies must charge each employee $10,000 to attend any gathering that paints America in a bad light. Is that speech or conduct? So give it to me one more time, Judge Grant. The company... Company, companies must charge each employee $10,000 to attend any gathering that paints America in a bad light. Is that speech or conduct? I think that's closer, Your Honor, but I, I think that, no, that seems to me, on reflection, to be clearly conduct. I don't... But what's different, what's different? That is precisely, Your Honor, I don't... No, I mean, I'm asking what's, what's different? No. What, what makes that... No. You're saying that's conduct? I'm saying that that is, just as here, that is a restriction on, on conduct. So you think Florida could pass that law and that would be fine? That it would have to charge... Well, sorry, let me think this through. So it has to charge an employee $10,000... Right. ...to attend. Then, then, no, that is distinct from this, this case, Your Honor, because they're, the, the, the, the business is not as free to, to espouse the idea. Well, why, why, explain to me why it's different. Because... It's still just, just telling me, it's still the business acting in a way to, you know, penalize or support various expression that the employee sees or hears. So, Your Honor, I think what makes it different is there, to the extent that is a regulation on, on conduct, the regulation itself clearly imposes a burden on the speech. It imposes a burden on the speech. But why doesn't this regulation impose a burden on the speech? This regulation makes sure that no one, the employee has, the employer has no right to exercise its ordinary, its entirely ordinary control over employees. And it can make employees attend seminars all day long on topics that are not covered by the law. But it removes that expressive ability of the company for certain topics. Why isn't that a restriction on speech? Well, setting aside the question whether the content is expressive, I think it's distinct because the Supreme Court said as far back as the Rowan versus United States Postal Service case, and has repeated many times, that the First Amendment just does not include the right to press even good ideas on unwilling listeners. Right, but it also, you can't, you can't restrict someone based on their viewpoint.  On unwilling listeners who are their employees, you can make them, you can make them listen to literally anything except this list of topics. Just as Judge Grant in Tracy, a professor could opine and engage in speech on an infinite variety of topics. But if it, if it, if it constituted professional practice, then they had to disclose it. And this court said that's not a burden on speech. That's, that is a conduct requirement. Why isn't this, just, if, let's just assume that this is burdening conduct. Why isn't this like Sorrell, where the Supreme Court said, look, there are these things where they're focused on content, I mean, they're focused on conduct, but at the end of the day, they have an effect on expression? For two reasons, Judge Brasher. First, I think Sorrell is best understood, and this is how I think this court has made the decision in the Norwegian case, as involving a restriction on the flow of information, which is itself a First Amendment expression. So I think there, there is a direct restriction on speech rather than a restriction on conduct, rather than simply a restriction on conduct that has an effect on speech. There is language in, in Sorrell saying that, that even if the restrictions on information were not understood as itself restricting speech, it would be burdensome on speech based on its conduct, akin to a law restricting a newspaper's ability to get ink. That comes back to my argument with Judge Grant. There, I think you clearly have a law that, to the extent it's regulating conduct and not speech, it's still doing so in a way that burdens speech based on its conduct, based on its content. So you would just distinguish Sorrell by saying that the burden on speech is not as, not as significant, not, not as important in this case? Not, not in terms of, it's distinct, not in terms of its significance or importance, but because of the line of cases where Rowan's saying that the First Amendment just doesn't include the right to distribute to the audience of your speech. Always, you know, if you can force people to listen to your speech, that speech is always going to be, in a sense, more effective. But the entire line of captive audience cases rejects the notion that that is a cognizable burden on speech. What, what if you said that you can, in a public auditorium, you can use a microphone to talk about how great the UGA Bulldogs are, but if you start talking about the Gators, microphone's off. So, I think that would be a time, place, and manner restriction on speech. And it would be one under O'Brien that appears not justifiable without looking at the content, content of the speech. But either, I mean, it's, it's a captive audience, right? You have a room full of people, and so you can't tell those, you can't tell those people about Florida, but you sure can tell them about Georgia. Why isn't that the same as this? In your hypothetical, was the audience captive? They're, they're in there. For whatever reason, the people are in there. They, you know, they can't leave. The standard is, is it practically feasible to, to avoid the speech? I don't think the fact that you have an audience, your honors are not my captive audience because we're all in the same room this morning. Has the captive audience doctrine ever applied in the employment context? Your honor, I'm, I'm not aware of a decision implying it in the, in the employment context. I can't think of any reason why it would not apply if it's a situation where, as I think, it meets the standards set forth in Urgenage. Seems like it would be a pretty drastic expansion to do so in this instance. Again, I don't see why, your honor. I mean, the, the fact that you're talking is, you know, is this a situation where it's practically feasible to avoid the speech? I think, you know, telling an employee you've got to listen to the speech or you'll lose your job certainly qualifies. Well, it could be a hypothetical, wouldn't it? Sorry about, Judge Wilson. The Middle District did apply the captive audience rationale. In what context? David Robinson versus the Jacksonville shipyards case in the employment context. What if an employer during its diversity training said, the person conducting the training said, there is racism in America, but there will not be any racism in this business, in this employment, period. Would that constitute a violation of the statute? In terms of that hypothetical, as you've presented it, I don't see how. What if, if, if this law stands, then couldn't another state somewhere else make a similar law that said, if you cannot force your employees to attend trainings where it is taught that all people of all races have equal abilities, you can only force people to attend trainings where you say that some races are worse than others or that, you know, women shouldn't be here or things like that? Your Honor, I think as far as the First Amendment goes, that's correct, that's correct. A state could do that. I think that there's an obvious Title VII problem there and there may be other types of legal objections as well. But from a First Amendment perspective? It's precisely the same. All right. Thank you, Mr. Ollendorf. We'll hear from Mr. Hallward-Driemeier. Thank you, Your Honor. I'm Hallward-Driemeier on behalf of plaintiffs at Belize and I'm splitting my time with my colleague, Ms. Agarwal, and our intent was that I would address the First Amendment issues and she would address the vagueness, overbreadth, and preliminary injunction factors. At the core of the First Amendment is a prohibition on the state restricting speech because the state disagrees with that message and that is exactly what we have here. The state has imposed a penalty of $10,000 if, but only if, the employer in a mandatory employee training environment advocates concepts with which the state disagrees. Those are the state's words. Advocates concepts with which the state disagrees. And we know that it is the speech that is being limited here, is strict, restricted, and punishing because we know, Judge Grant, as your questions indicated, that the employer can mandate attendance at a training, can put DEI training on the agenda, can start to address these topics generally, and it is only at the point at which the employer crosses some very difficult to understand line that my colleague will discuss into advocacy of these concepts that the statute has been violated. Here's a hypothetical for you. What if the law said, no employer may alter their employees' terms and conditions of employment by forcing them to attend a meeting endorsing discriminatory behavior by employees? Could a state make that law? I don't think so, Your Honor, because it's, again, just the speech endorsing something that is the violation. It's the speech that is the violation, not the consequence on the terms or conditions of employment. And that's what distinguishes this statute from, for example, the hostile work environment context that the state has cited under Title VII because hostile work environment is actionable only when it is so severe or pervasive  in the terms or conditions of employment. So we have to know the context. We have to know the consequence of it. It's not the words themselves that are the violation. Here, the state has said the words themselves. The audience at the employer could be welcoming this information. They could agree with the information, or even if they didn't, they could say, you know, that was actually very thoughtful. I at least need to give that some thought. Could the state say that, could the state establish a rule that these types of speech were per se established an abusive working environment? No, Your Honor, the state cannot simply declare that speech with which it disagrees, concepts with which it disagrees, are by the state, you know, sort of dictate abusive. What if the state of Florida was very thoughtful? As states are, right, they're very thoughtful. And they looked at all of the 11th Circuit's case law, and they said, okay, these are the things that the 11th Circuit has said constitute a hostile work environment, right? You know, we've got this case here that identifies this as a problem, this case here that identifies this as a problem. And it passes this statute that says you're not allowed to do these specific things. You're not allowed to say racial epitaphs. You're not allowed to show, you're not allowed to take the position that women are not as smart as men, right? Like, you're not allowed to do these things because they do that. Well, Your Honor, I'm not aware of the cases that hold that just saying those... Yeah, they don't hold that. They're just, these are facts, right? These are facts, right? And again, so that's what our point is, that here it is, though, as the words leave the mouth, it's the low ball in the comic strip. The words themselves are what have violated the statute if they amount to advocacy. We don't need to know what impact it had on the audience if any. So there's none of that context. That's how we know that this is not conduct that the statute is going after, but it is the speech alone. And this distinguishes it from Norwegian Cruise Line, which my colleague cited too. Because in Norwegian Cruise Line, the court was very clear that what the statute was getting at, its focus, was the exclusion of passengers from the ship, excluding the main customer from the establishment. It was that act that was the goal. The speech restriction was incidental because that just was about how you learned or not whether somebody was or was not vaccinated. But that was entirely incidental. The act that was being prohibited was the act of prohibiting the person from attending. They would say that the act here, right, as you said, was mandating the attendance of someone at this harmful event. But of course, that act of mandating attendance is not actionable. Because we can mandate the attendance and we can talk about these issues. As long as we mouth the party line of the state of Florida, that wokeness is a bad thing, we're okay. If we disagree with the party line of the state of Florida and say, actually, these things are real. Racism is systemic here. It gives rise to implicit bias that you may not even be aware of. And it's necessary. You can't say, I'm immune from it because it is so pervasive in this society. If you say those things, which the state of Florida has deemed too woke, then you are subject to $10,000 civil penalty. So let's assume that we agree it's speech and also assume that we agree that this law advances a compelling interest of combating illegal discrimination. I'm not asking you to concede. I'm just asking you to assume. What would be a more narrowly tailored way of reaching that goal, of accomplishing that goal? I would note a number of things. First is that we would say that it's always more burdensome than necessary because it is vague. Because it's very difficult to know at what line you've crossed from objectivity into advocacy. Because whether you violate some of these provisions, I have to say the state's position is reply brief on some of them are inconsistent. I don't even know. So vagueness is itself an indication that the statute prohibits more chills, more speech than it needs to. But in terms of the effect of discriminating, again, you can go in and you condemn these woke ideas. You can say, you know what, colorblindness is the only way to treat people. Well, that can have the same impact on somebody who is experiencing systemic racism as going in and saying, you know, colorblindness is wrong because of systemic racism. It's just different people who are being impacted. And here the state has chosen only to prescribe one of those messages. It's the viewpoint-based discrimination that's wrong. The state cites Hilby, Colorado. It cites other cases involving time, place, or manner. Time, place, or manner is an exception to First Amendment protection only if it is content neutral. This is the antithesis of content neutral legislation because it is only if one advocates the position with which the state disagrees that it applies. So I think your answer to me and your answer to Judge Grant are similar. I just want to make sure I understand what your position is. So I ask you, could the state just say, these are things that have been a problem under Title VII. We're banning these things. Your response seemed to indicate that the state couldn't do that because you needed to have sort of an individualized assessment in each case. Is that kind of what you're saying? That's right. You need to determine whether it is so pervasive, so severe to amount to a change in the terms or conditions of employment. That's the context of it. The state is not banning specific words. We're looking at the words only to understand have you reached the prohibited conduct, which is the act of discriminating in the terms or conditions of employment. Title VII says nothing about words. Right. The words may, for instance, be evidence that you have actually done it. But you're saying Title VII is basically, I mean, and I don't want to put words in your mouth, so correct me if I'm wrong, but I mean, you're saying Title VII is sort of the least restrictive means that can be adopted and there's nothing beyond that, that a state could do one way or the other to address things that would be viewed as discriminatory. There's nothing more that the state could do, but we know that it doesn't need to do this because Title VII already prohibits what it claims is its legitimate sweep. And I want to go back, Judge Grant, to one of your questions to opposing counsel, which I think was very instructive, which is that if the state is correct here, then the state can turn any speech restriction into something that's immune from First Amendment scrutiny simply by labeling some act and saying you can't do this act or we're going to punish this act, but only if you couple that with the speech we don't like. And we know that that's not the law because the Supreme Court, Kerry v. Brown and Frisbee v. Schultz have described that kind of situation, which was anti-picketing law. Of course, picketing is the act of marching up and down, right? But in Kerry v. Schultz, there was not just a categorical ban on residential picketing, there was an exception for labor picketing. And the courts said you can't do that because that's not content neutral. You don't fall under time, place, or manner. In Frisbee, it was a categorical ban on picketing in residential areas. So they said that is time, place, or manner because it is content neutral. Now here, what they're suggesting is you don't have to do content neutral. You can simply say you cannot walk up and down on the street. That's the conduct. If your message is about labor dispute, right? We know that that's not permissible because that's what Kerry v. Brown held. And yet- Can you make a law that said you can't make employees attend any mandatory trainings? Well, Your Honor, that would be, I suppose, a time, place, or manner in the sense that it would be content neutral. And I think we'd have to have other questions about whether in the notion of a meeting is it self-communicative, right? I think, and we've made the argument, that these employee meetings are there for the purpose of communicating. That's why you have a meeting, right? And then, moreover, in the context of this case, to say that it's mandatory is it self-communicative because in the scope of all the things that you might be doing on company time right now, we, the employer, are saying this is the most important thing for you to be doing on our time, to be here listening to this presentation, understanding these issues, understanding how some of your co-workers might be experiencing the world differently than you do. That is an important message. It's a message that is fundamental to our clients, but it's not a message with which this Court needs to agree because the First Amendment, as Your Honor's question indicates, the speech we want to make is favored or disfavored. That is the beauty of the First Amendment. Thank you, Your Honor. Okay. Ms. Agarwal. May it please the Court. Shalini Goyal Agarwal on behalf of plaintiffs. I'm going to be addressing vagueness and overbreath. There are four points I'd like to make, three on vagueness and one on overbreath. First of all, in the First Amendment context, there is a heightened vagueness standard. If a restriction is viewpoint or content-based at this Court established and recognized in Walschlager, it's subject to a more stringent vagueness test. Second, this law fails the basic vagueness standard insofar as people of ordinary intelligence are unable to actually understand what they can and cannot say. Therefore, it's susceptible to arbitrary and discriminatory enforcement. And we think that's the easiest and simplest way to resolve the vagueness argument is based on Provision B of the statute, the purported safe harbor that allows discussion in an objective manner without endorsement. But we also think that we make that argument with respect to each of the eight concepts as well. The third point I'd like to talk about is defendants' cases involving dictionary definitions. And those all involve many more concrete terms than the abstract concepts we have here. Can I ask you just a quick question before you get into that about the vagueness argument? Under this vagueness argument, do we have to look at each individual section of this for vagueness? Or is there some way for us to address a vagueness? I mean, I guess my point is this statute prohibits a lot of speech. Do we have to look at each prohibition to determine whether that's vague or not? What do you think about that? No, I don't think we do. And we make that argument as the district court concluded below. If you just look at Provision B, right, which says that any of the concepts above may not be construed to prohibit discussion. Right, right. So, I mean, your argument then that we don't have to look at the entire thing relies entirely on us concluding that B is void for vagueness. Right? That's right. You could also conclude that about Provision A as well in terms of the advance or espouse, right? I think those are akin to the endorsement idea. So it straddles both provisions. OK, thank you for that. How vague is B really? Because couldn't you say, you know, some people say that some individuals by virtue of their race, color, sex, or national origin are inherently racist, sexist, or oppressive, whether consciously or unconsciously. Wouldn't that kind of be a pretty straightforward way to understand teaching something objectively? Could it be just reading out the words of the concept directly? Well, I mean, yes, at its most basic nature. But I mean, I don't have a hard time, I don't think, understanding really what these eight topics are. And then the difference between kind of teaching that some people say this versus saying this is what I think and this is what you think. How vague are these really to a person of common understanding who has been in Florida or the United States for the last five years? You're having an idea of an objective discussion of a controversial concept to think about how a reasonable person would, like putting the reasonable person standard there, where this is how we have objective and other statutes that defendants have cited. It's kind of alien to the First Amendment analysis to say, okay, well, how would a reasonable person express this controversial concept? I think that that is the fundamental problem with why there is a vagueness issue with that provision B. And if you look at just the concept you're talking about, number two, related to unconscious bias, I think that maybe describing what unconscious bias is, which is what our plaintiff, Shavara Oren, mentioned in her declaration to talk about that a person has biases based on the culture in which they are steeped. And I'll confess, defendants graded us on the examples of the concepts that we gave and said, okay, well, these ones are permissible, these ones are not. And I was surprised by some of the grades that we received, which I think reflects sort of some of the vagueness issues that are at play. But with that description of being by virtue of the culture in which a person is raised or in which they're steeped, defendants say that that's totally permissible. And I think it's really hard to parse it that finely. And you could imagine an immigrant family, how is being raised in that culture, how is that distinguishable from national origin or from race? I think that the impossibility of sorting through how these concepts amount to, when your discussion of them amounts to an endorsement is really the problem. So, but you think the concepts are potentially clear and it's harder to sort out whether the company would be endorsing versus describing the concepts as the problem? No, we think that they're both provisions are not clear. So, you know, the without endorsement, I think is you can imagine the applications. Like, you know, if you have a person, if it's something different than just I read the concept and I say, yes, I endorse this. Imagine that you have the employer at the beginning of their presentation, give a disclaimer saying, okay, nothing I'm about to talk about is something that I specifically endorse. And then they discuss the concepts and they cast them. It seems like they're casting them in a favorable light. Maybe they smile when they are talking about people who are in support of the concepts and they maybe like frown when they're talking about criticisms of the concepts. And then at the end, they say, but just by the way, let me restate my disclaimer. Would they actually be endorsing the concepts? It's impossible to know. I think it depends in large part on whether a fact finder would ultimately agree or disagree with the concepts. Or what if the fact finder were to say, I don't think while you may have discussed them in an objective manner, in a sense, you didn't sufficiently talk about what's problematic about the concepts. And so on that basis, I've decided that actually, no, your presentation was not objective. The impossibility of figuring out a line, I think is the easiest and simplest way to dispose of the case. But I think if you look at another example that we give, turn to the concepts themselves. If you look at an example from our brief where Plaintiff Chevron talks about the concept of talking, that white people should have a sense of humility. She's talking about a history of racial violence. She gives a presentation to employees about that. And she says, based on this history that shows white violence or discrimination against black people in the modern day, white people must have a sense of humility. And that has a moral valence and arguably would violate concept one, arguably would violate concept three. That is one of the challenges. Defendants say that there's also a privilege that attaches. That's something that Ms. Oren speaks about in her presentations. Defendants say that her discussion of that is okay under concept four. But under concept three, they say she can't talk about a privilege, which also is about acknowledging privilege. Because of the inconsistency of application, each of the concepts is basically too hard for a reasonable employer to understand in advance what I'm allowed to say and what I'm not. All right. Thank you, Ms. Agawam and Mr. Ohlendorf. You've reserved some time for rebuttal. I want to ask, I just want to ask you, how would this, how does this statute operate? If, in other words, how would it be enforced? You would have to have an employee who attends mandatory training complain to the state and then the state would make a determination as to whether or not the statute is violated and then fine the employer $10,000. Is that how it works? I think so, Your Honor. I haven't reviewed the enforcement mechanism. Well, if that's the case, then it seems like what we're looking at is the speech itself and not the conduct of the employer, if that's how it works. I don't think so, Your Honor, because what would trigger the penalty, again, is the act of making attendance mandatory. And just a few additional points, Your Honors. First, on the $10,000 hypothetical, I think that would be unconstitutional for all the reasons that I mentioned earlier. I think it would also clearly be unconstitutional for an additional reason, and that is clearly a penalty on the First Amendment rights of the audience, right? Could Florida pass, just simply pass a law that prohibits mandatory diversity training? Yes, Your Honor. Certainly, it could. That's not what this does. This goes a little further than that. If you pass that law, then you could make a good argument that the statute just regulates conduct and not speech, right? I think you could. I think it would be the same argument as here, Your Honor. Of course, here you have a... Here you got to look at... You have to look at what's said, though. You have to look at what's said in order to... Let me ask the question before you answer it. You have to look at what is said at the diversity training before we're able to determine whether or not the statute is violated, right? That is correct, Your Honor. And I, again, return to the Supreme Court's emphatic decision in the case that it's never been thought unconstitutional to examine the content of speech to determine whether restriction on conduct is law. So, again, Judge Grant, I think the $10,000 hypothetical would clearly be a violation of the First Amendment rights of the audience members to have to pay a $10,000 penalty to hear speech. On Title VII, I think... The First Amendment generally applies to speakers, too, right? I mean, isn't this a penalty on the speaker? I know it is for all the reasons that we've discussed. I'm just saying that that... would clearly be a penalty. What if a company were allowed to give a training on a prohibited topic, but only if it paid $10,000? The company is... Into the state anti-woke fund. The company is charged $10,000 for... I think that would be much closer, Your Honor, to the Sorrell case, where it's a restriction on conduct in a sense, but it is imposing a clear burden on the speech itself. Why is not allowing the speech... the speech to happen in a mandatory way less of a burden than paying money? The Supreme Court, again, has said in the captive audience cases that not being able to force your speech on someone else is not a burden. They could force the speech on the employees in my second example. They just have to pay. In both instances, you're forcing people to listen to the speech. I think that example is different from the law that we have here. Could Florida outlaw trainings that employees find tiresome or a waste of time? Maybe a lot of... Well, I won't specify what types of trainings, but could Florida say, trainings that employees just don't really want to do, you can't do that? Again, to be frank, I don't see any First Amendment problem. Wouldn't there be a vagueness problem there? Possibly, but I don't think it's a First Amendment problem, so it doesn't go into the speech versus conduct divide, I think. Why wouldn't it be, Your Honor, that the government controlled the message that an employer delivers to their employee? It doesn't control the message, Judge Wilson. The state is free to, as under this law, the state is free to proclaim at its trainings whatever message it wants. It just can't mandate attendance. It just can't mandate attendance. Let's assume that this is a regulation of speech. Could you just give your best argument? I mean, this is the same path I went down with the other side, but just your best argument that this meets strict scrutiny, that this is narrowly tailored to accomplish a state objective? Mr. Grager, so we think it is, it furthers the same, the same interest as Title VII hostile environment claims further, keeping racist and sexist and discriminatory speech out of the workplace. I think my friend's answer to the Title VII comparison is completely unpersuasive. I think, you know, his first answer is to say, well, Title VII actually doesn't regulate speech at all. It just regulates conduct, but that's not so. There are plenty of cases where it's speech itself, fewer speech, constitutionally protected speech that is what creates the hostile environment claim. The statute, the language of the statute, I suppose, refers to conduct, but the EEOC regulation governing hostile environment claims refers to speech. So I don't think you can get out of it that way. He says, well, there the speech has to be severe and pervasive, right? And that's true because as a statutory matter, it's only severe and pervasive speech that alters the conditions of employment. But I've never heard anyone suggest that that is some sort of First Amendment limit, that severe and pervasive speech is the outer bounds of a state's ability to regulate racist and sexist speech in the workplace. And that would make no sense. Why would the severity of the speech make a First Amendment difference? I mean, one... Well, because that's what changes the terms of the employment. Whereas you can say whatever horrifying things you want on a street corner, but what's different about the employment context is that saying things that create a severe and pervasive, you know, bad atmosphere really change the terms of that person's employment in a different way. But the reason that matters is because that is the scope of Title VII, not because that is the scope of the First Amendment. Right. One can hardly think of more severe speech than the speech in Snyder v. Phelps, right? The funeral protest case. But of course, the fact that speech is not just offensive, but severely offensive, does not make it... It seems like his argument on that, referring to the other side's argument, is that it's narrowly tailored, Title VII is, because it requires kind of a case-by-case adjudication about whether the speech altered someone's conditions of employment, and that this law is not narrowly tailored because it doesn't require that kind of case-by-case adjudication. Could you address that? I don't see why the case-by-case nature of the adjudication goes to narrow tailoring. Again, it goes to whether the speech meets the statutory requirements of Title VII. And here, Your Honors, the interest that the state is driving just is requiring attendance at workplace trainings where these ideas are inculcated. So I can't think of any more tailored approach to addressing that interest. Here's just a hypothetical. Perhaps Florida could have passed a law that gave an employee the right to sue if they suffered, I don't know, mental distress, mental or emotional distress, in light of being required to attend a presentation like this. What about that as a more narrowly tailored option? I don't think so, Judge Brasher. And I think this idea of whether the speech has caused some kind of mental distress is kind of a fiction created by the plaintiffs. There's no indication that that is what the state was aiming at here. The state, I think, has an interest in protecting people from racist and offensive speech even if they would misguidedly welcome it. Really? That's it? So the state has an interest in protecting me from hearing things that I want to hear? I think so, Your Honor. I don't see why whether the employee welcomes hearing that they are a morally inferior race goes to the state's interest. Does the state have an interest in protecting people in Skokie from hearing Nazi speech? I mean, some of the attendees probably enjoyed that parade. Why didn't the state have an interest in making sure that they didn't hear that very harmful and wrong speech? Your Honor, I think... I think whether the state had an interest in that, clearly the restriction was not tailored to advance it. And here, Your Honor, I would point as well to the fact that keeping racist speech out of the workplace, I think, clearly is a compelling interest. And that united the state's interest in protecting tax employees, its workers, from being conscripted into listening to this speech. So it is only the union of those two interests that the state is... the act here is furthering. All right. I think we have the argument, counsel. Thank you. And the court will be in recess for 15 minutes.